Filed 3/6/23  D.A. McCosker Construction v. Dept. of Water Resources CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| D.A. MCCOSKER CONSTRUCTION et al., | C089969 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34-2017-00209945-CU-PT-GDS) |
| v. | |
| DEPARTMENT OF WATER RESOURCES, | |
| Defendant and Appellant. | |

The Department of Water Resources (DWR) and D.A. McCosker Construction Co., doing business as Independent Construction Company (ICC), entered into a contract for the construction of a reservoir near the City of Livermore.  After ICC completed the project, DWR sought to avoid paying ICC on the ground that ICC was an unlicensed contractor at the time of the project.  It based its argument on the Contractors' State

1

License Law (Bus. & Prof. Code, § 7000 et seq.),[1] which provides that a contractor may not maintain any action to recover compensation for "the performance of any act or contract" unless it was duly licensed "at all times during the performance of that act or contract." (§ 7031, subd. (a).)

ICC and its surety, Fidelity & Deposit Co. of Maryland (Fidelity), successfully sought relief against DWR in arbitration—the required forum under the parties' agreement. The arbitrator rejected DWR's claim that ICC was unlicensed and awarded ICC over $5,000,000 in damages. But a trial court later vacated the arbitrator's award, agreeing with DWR that ICC lost its license after it began the project. The court based its conclusion on sections 7068 and 7068.1. Section 7068 allows a corporation, like ICC, to qualify for a contractor's license through a "responsible managing employee" who has the necessary experience and knowledge to qualify for a contractor's license in his or her own right. Section 7068.1, in turn, in the trial court's reading, requires a corporation's responsible managing employee to exercise direct supervision and control over all the corporation's construction operations. Applying this interpretation of section 7068.1, the trial court concluded that ICC violated this statute because its responsible managing employee failed to directly supervise and control the project in this case. It further concluded that ICC's license was automatically invalidated at the time this violation occurred, leaving ICC unlicensed during the project.

On ICC's and Fidelity's appeal, we reverse. The trial court premised its conclusion on the wrong version of section 7068.1. At the time of trial, the statute required a responsible managing employee to "be responsible for exercising that direct supervision and control of his or her employer's or principal's construction operations to secure compliance with" state licensing laws. (Former § 7068.1; Stats. 2013, ch. 180,

_____

[1] Undesignated statutory references are to the Business and Professions Code.

2

§ 1.)  The trial court relied on this language in its decision.  But at the time of the project, the relevant timeframe here, the statute read a little differently.  It required the responsible managing employee to "be responsible for exercising that direct supervision and control of his or her employer's or principal's construction operations *as is necessary* to secure full compliance with" state licensing laws.  (Former § 7068.1, italics added; Stats. 2006, ch. 106, § 2.)  The "as is necessary" language is important.  It shows that a responsible managing employee's obligation to exercise direct supervision and control depends on the facts, refuting the trial court's conclusion that a responsible managing employee must always exercise direct supervision and control over the corporation's construction operations.  We will remand the matter to the trial court for further consideration under the applicable version of the statute.

BACKGROUND

I

*The Dyer Project*

The McCosker family formed D.A. McCosker Construction Co. over 80 years ago.  For the last 20 years, Brian McCosker (Brian) has served as its president and Kevin McCosker (Kevin) has been its designated "responsible managing employee" within the meaning of section 7068—a statute providing that a corporation can qualify for a contractor's license through a "responsible managing employee" who has the requisite knowledge and experience to hold a contractor's license in his or her own right.  (§ 7068, subd. (b)(3).)  Kevin began serving as D.A. McCosker Construction Co.'s responsible managing employee starting in 2001.

In 2009, DWR and D.A. McCosker Construction Co., doing business as ICC, entered into a contract for the construction of a project known as the Dyer Reservoir, South Bay Aqueduct Enlargement (the Dyer project).  ICC, which served as the project's general contractor, completed the project three years later in 2012.  Brian oversaw the project.  Kevin, although kept informed of the project, had no involvement with it.

3

According to the Contractors State License Board's records, D.A. McCosker Construction Co. was a licensed general contractor during the whole of the Dyer project.

## II

### *First Arbitration Proceeding*

Several months after the project's completion, ICC and Fidelity (collectively, ICC) filed a complaint against DWR in arbitration—the required forum for disputes under the parties' agreement and the State Contract Act (Pub. Contract Code, § 10100 et seq.). (See Pub. Contract Code, § 10240.) ICC also joined several of its subcontractors, including Monterey Mechanical Co., in the suit. ICC alleged it was owed additional compensation for performing work above that required in the parties' contract. It also alleged that DWR improperly deducted liquidated damages from the amounts it owed ICC and that, after DWR's deduction of these amounts led to ICC's subcontractors (including Monterey Mechanical Co.) not getting paid, DWR withheld further payments from ICC. ICC sought over $12,000,000 in damages.

DWR afterward filed a cross-complaint against ICC, alleging it was entitled to deduct an additional $1,905,000 in liquidated damages because ICC untimely completed the project. It also contended ICC's claims failed for three reasons relevant to this appeal. First, it alleged that ICC failed to exhaust the administrative remedies described in the parties' contract. Second, it argued that ICC's damages calculation was flawed because its damages expert, Gene Lash, relied on hearsay for his conclusions. And third, after the close of evidence in the arbitration proceedings, it asserted that Kevin was a "sham" responsible managing employee and did not supervise the Dyer project. Based on this last argument, DWR argued that ICC's license was invalid and that, as a result, DWR was entitled to recover all amounts it had paid ICC for the Dyer project.

The arbitrator ruled largely in ICC's favor. Starting with DWR's arguments, he found none of them persuasive. He found ICC sufficiently exhausted the administrative procedures described in the parties' contract. He found Lash relied on documents that

4

were admissible under the business records exception to the hearsay rule. And he indicated that Kevin was a legitimate responsible managing employee who worked for ICC, had been its responsible managing employee for years, and helped manage ICC. Turning to ICC's claims, the arbitrator found DWR owed ICC additional funds for certain costs incurred, improperly deducted liquidated damages, and improperly withheld payments. After accounting for prejudgment interest and certain costs, he awarded ICC over $5,000,000 in damages.

III

*First Trial Court Proceeding*

ICC and DWR later filed competing petitions with the trial court. ICC sought to confirm the arbitrator's award and named DWR and Monterey Mechanical Co. as respondents. DWR, in turn, sought to vacate the award, raising the same type of arguments it brought before the arbitrator: ICC failed to exhaust administrative remedies, the arbitrator's award was impermissibly based on hearsay, and ICC's license was invalid because Kevin failed to adequately supervise the Dyer project. It also raised an additional ground for finding ICC's license invalid: Kevin improperly held an active contractor's license in Nevada during the Dyer project, violating section 7068's general rule prohibiting a person who qualifies a corporation for a contractor's license from holding "any other active contractor's license."

After hearing from the parties, the trial court vacated the arbitration award and remanded the matter to the arbitrator for further consideration. Although the court rejected DWR's contention that the award was impermissibly based on hearsay, it found remand to the arbitrator appropriate to address part of DWR's exhaustion argument. It further found remand appropriate to allow the arbitrator to evaluate DWR's new claim about Kevin's Nevada license and to provide greater clarity about Kevin's role in ICC.

5

## IV

### Second Arbitration Proceeding

On remand, DWR expanded on its argument that ICC's license was invalid. It argued, as before, that Kevin failed to adequately supervise the Dyer project and held a separate contractor's license in Nevada. It then added a new ground for finding ICC's license invalid: ICC failed to show that Kevin was a bona fide employee, violating section 7068's requirement that the responsible managing employee be a "bona fide" employee.

After hearing from the parties, the arbitrator again found in favor of ICC, though without addressing DWR's claim concerning Kevin's Nevada license. It found ICC exhausted all required administrative procedures required in the parties' contract. It also found Kevin "met the bona fide employment requirements to be [a responsible managing employee] and provided 'direct supervision and control' [through] his work in managing ICC in general and his continuing communication and consultation with Brian McCosker related to Dyer and the project that he was directly supervising."

## V

### Second Trial Court Proceeding

Following the arbitrator's decision, ICC and DWR again filed competing petitions with the trial court. ICC sought to confirm the arbitrator's award, and DWR sought to vacate the award. DWR argued that "ICC is disallowed from recovering compensation from DWR and must disgorge amounts paid if ICC performed any portion of the Dyer contract without full compliance with the licensing requirements of the [Contractors' State License Law]." It then contended ICC violated this law for four reasons. DWR had raised three of these reasons before: Kevin improperly held a separate contractor's license in Nevada, was not a bona fide employee of ICC, and failed to exercise direct supervision and control over the Dyer project. It now offered a fourth reason: Kevin improperly "qualified his own Nevada construction company" during the Dyer project,

6

violating section 7068.1's general rule prohibiting a person who qualifies a corporation for a contractor's license from "act[ing] in the capacity of the qualifying person for an additional individual or firm."**2**

The trial court vacated the arbitrator's award and, without a further remand, largely resolved the case in DWR's favor. Without resolving DWR's claim that Kevin was not a bona fide employee, the court found ICC violated the Contractors' State License Law in three respects: Kevin improperly held a separate active contractor's license during the Dyer project, Kevin improperly qualified a separate firm for a contractor's license during the Dyer project, and Kevin failed to exercise direct supervision and control over the Dyer project. The court also, at least initially, found "ICC was not a duly licensed contractor for the Dyer Project" because of these violations.

But in a later ruling, the court stopped short of finding that ICC lost its license because of Kevin's separate license and separate firm, finding it sufficient to focus on Kevin's inadequate supervision and control over the Dyer project. It found this latter violation caused ICC's license to be automatically invalidated at the time the violation occurred, leaving ICC unlicensed at the time of the project. And because, per section 7031, a contractor that is unlicensed at any time during a project cannot maintain an action for compensation for work performed on that project, the court concluded that ICC could not pursue its action against DWR. The court also addressed DWR's claim for disgorgement. Although the court acknowledged that section 7031 allows a party to maintain an action for disgorgement against an unlicensed contractor, it declined to order

---

**2** DWR claims it raised this issue in the second arbitration proceeding. But while it asserted the facts underlying this claim at that time, it does not appear to have raised the claim itself until the second trial court proceeding.

7

disgorgement here, reasoning that "DWR has not properly brought an action for disgorgement."[3]

ICC timely appealed. DWR timely cross-appealed. The matter was fully briefed on October 7, 2022, and assigned to this panel on October 31, 2022.

DISCUSSION

I

*Standard of Review*

The State Contract Act governs the parties' contract in this case and describes the standard of review for trial courts. It requires parties to pursue their claims in arbitration in the manner described in Public Contract Code section 10240 et seq. It also, following the arbitrator's award, allows parties to petition the trial court to confirm, correct, or vacate the award. (Pub. Contract Code, § 10240.12.) Unless the parties agree otherwise, the trial "court shall vacate the award, or part thereof, if it determines either that the award, or part thereof, is not supported by substantial evidence or that it is not decided under or in accordance with the laws of this state." (*Ibid.*)

On appeal from a trial court's decision applying this standard, appellate courts typically must evaluate the matter independently. That is because whether substantial evidence supports an arbitrator's finding and whether an arbitrator decided a matter consistent with the law are both legal questions subject to independent review. (See *People v. Banks* (2015) 61 Cal.4th 788, 804 ["the sufficiency of the evidence is

---

[3] Following the trial court's ruling, the Legislature amended section 7068.1 to allow responsible managing employees to delegate their responsibility to exercise direct supervision and control. (§ 7068.1, subds. (a), (c)(3).) The bill's supporters believed the change was "necessary to respond to recent litigation 'wherein a judge in the Superior Court of Sacramento found that the [responsible managing employee] was not satisfactorily involved in a project, and as such, the contractor was operating as an unlicensed contractor.' " (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 830 (2021-2022 Reg. Sess.) as amended Sept. 3, 2021, p. 7.)

ultimately a legal question"]; *Haworth v. Superior Court* (2010) 50 Cal.4th 372, 384 [questions of law are reviewed independently].) In both circumstances, the reviewing court should grant no deference to the trial court's determinations.

But in this case, the trial court did not simply consider whether the arbitrator's decision lacked evidentiary or legal support under Public Contract Code section 10240.12's framework; it also allowed the parties to submit new evidence to support their positions on the merits. The parties offer competing views on the propriety of this approach and its effect on the standard of review. According to ICC, the court exceeded its authority in allowing further factual development post-arbitration. But according to DWR, the court acted consistent with existing case law authorizing trial courts to conduct their own factfinding after an arbitrator's factfinding in cases involving section 7031. DWR adds that, in these circumstances, "the question is not whether the arbitrator's conclusions rested on substantial evidence but rather whether [the trial court's] conclusions do." (Underscoring omitted.)

We need not resolve here, however, whether the arbitrator and the trial court could both conduct factfinding on the same topics, though we acknowledge some case law supports this approach. (See *Ahdout v. Hekmatjah* (2013) 213 Cal.App.4th 21, 38-40 [because "section 7031 constitutes an 'explicit legislative expression of public policy,' " a trial court must consider " 'all of the admissible evidence submitted to it regardless of whether that evidence was before the arbitrator' "].) Nor need we resolve whether a trial court's doing so could change the relevant standard of review from one deferential to the arbitrator's factual findings to one deferential to the trial court's factual findings. That is because our decision here does not concern the trial court's factual findings at all. It instead, as shown below, concerns questions of fact that only the arbitrator considered and questions of law. We will review de novo the trial court's and arbitrator's legal conclusions and review for substantial evidence the arbitrator's factual conclusions.

9

## II

### *Direct Supervision and Control*

ICC contends the trial court's finding that it lacked a valid license at the time of the Dyer project is wrong for three reasons. First, it asserts the trial court misconstrued section 7068.1's "direct supervision and control" requirement. While the court believed this provision requires a firm's responsible managing employee to exercise direct supervision and control over each of the firm's construction projects, ICC asserts it instead requires the responsible managing employee to exercise direct supervision and control over the firm's construction operations "as a whole." It then contends Kevin satisfied this requirement. Second, even if Kevin violated this requirement, it asserts the court had no authority to deem it unlicensed at the time the violation occurred. And third, even if the court had this authority, it contends the court should nonetheless have found its license remained in effect because it substantially complied with the law. Focusing on ICC's first point, we agree the trial court misconstrued section 7068.1, though not for the reason ICC offers.

The Contractors' State License Law "imposes strict and harsh penalties for a contractor's failure to maintain proper licensure." (*MW Erectors, Inc. v. Niederhauser Ornamental & Metal Works Co., Inc.* (2005) 36 Cal.4th 412, 418.) Section 7031, subdivisions (a) and (b) describe the penalties relevant here. Under section 7031, subdivision (a), a contractor that performs work without the required contractor's license generally cannot bring an action for the collection of compensation. And under section 7031, subdivision (b), a person who has paid an unlicensed contractor typically can bring an action to recover "all compensation" paid to the contractor for work performed, even if the work was performed properly. Section 7031 " ' "represents a legislative determination that the importance of deterring unlicensed persons from engaging in the contracting business outweighs any harshness between the parties, and that such deterrence can best be realized by denying violators the right to maintain any action for

compensation in the courts of this state." ' " (*MW Erectors, Inc.*, at p. 423, italics omitted.) It thus "will be applied, regardless of equitable considerations, even when the person for whom the work was performed has taken calculated advantage of the contractor's lack of licensure." (*Id.* at p. 424.)

In this case, ICC qualified for a contractor's license through its responsible managing employee, Kevin, starting in 2001. But the trial court found ICC's license was later invalidated when Kevin violated section 7068.1's "direct supervision and control" requirement. Quoting the statute as written at the time of its decision, the court stated: "[T]he 'person qualifying on behalf of an individual or firm' 'shall be responsible for exercising that direct supervision and control of his or her employer's or principal's construction operations to ensure compliance with this chapter and the rules and regulations of the board.' " (See former § 7068.1; Stats. 2013, ch. 180, § 1.) Considering this language, the trial court concluded that a company's responsible managing employee must directly supervise and control all the company's construction operations, including its construction operations for each project. It then found that because Kevin failed to exercise direct supervision and control over the Dyer project, ICC's license was automatically invalided at that time.

But at the time of the project, section 7068.1 read somewhat differently than the trial court believed. As relevant here, it stated: "The person qualifying on behalf of an individual or firm . . . shall be responsible for exercising that direct supervision and control of his or her employer's or principal's construction operations *as is necessary* to secure full compliance with the provisions of this chapter and the rules and regulations of the board relating to the construction operations." (Former § 7068.1, italics added; Stats. 2006, ch. 106, § 2.)[4] While the focus has been on a slightly different version of the

---

[4] A former regulation defined the phrase "direct supervision and control" at the time of the project. It stated: "For purposes of Section 7068.1 of the [Business and Professions]

11

statute that went into effect after the Dyer project's completion, our focus is on whether Kevin complied with applicable law at the time of the Dyer project, not whether he complied with a law that was not yet written. (See *Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1208 [" 'legislative enactments are generally presumed to operate prospectively and not retroactively unless the Legislature expresses a different intention' "].)[5]

Focusing on section 7068.1 as written at the time of the project, we reject the trial court's premise that a company's responsible managing employee must directly supervise and control each of the company's projects. The relevant text of former section 7068.1, again, required a company's responsible managing employee to "exercis[e] that direct supervision and control of . . . construction operations as is necessary to secure full compliance" with the Contractors' State License Law and associated regulations. (Stats. 2006, ch. 106, § 2.) The "as is necessary" language shows the need to exercise direct supervision and control depends on the context. For some projects, direct supervision and control may be necessary to secure compliance. But for other projects, it may not.

---

Code, 'direct supervision and control ' includes any one or any combination of the following activities: supervising construction, managing construction activities by making technical and administrative decisions, checking jobs for proper workmanship, or direct supervision on construction job sites." (Former Cal. Code Regs., tit. 16, § 823, subd. (b).)

[5] One amicus curiae explicitly discussed the "as is necessary" language. It wrote: "[T]he 'as is necessary' modifier in . . . § 7068.1 underscores that the activities need not occur all of the time, but only 'as is necessary' to secure [Contractors' State License Law] compliance. This could mean very little, if any, involvement in a particular project, so long as 'construction operations' are adequately supervised." DWR filed extensive responses to the amici, including this amicus, but elected not to acknowledge or otherwise address the "as is necessary" language in its response. And although, in a response to a later amicus brief, it ultimately acknowledged that the 2007 version of section 7068.1 controls, it still failed to discuss the import of the "as is necessary" language. DWR, then, had multiple opportunities to provide its analysis of the operative language but chose to forego these opportunities.

12

The context matters, including the type of project and the capabilities of the construction staff.

Here, the record shows that Kevin did not directly supervise and control construction operations for the Dyer project. But it shows he was at least kept apprised of "what was happening" on the project through "regular if not daily" discussions with Brian. It also shows that ICC appeared to employ capable staff for the Dyer project. According to ICC's evidence, Brian oversaw the project. He had been a licensed contractor and, at the start of the Dyer project, had worked for ICC for about 25 years and served as its president for about 15 years. An experienced ICC employee served as the project's general superintendent. At the start of the Dyer project, he had worked for ICC for about 15 years, had served as a general superintendent for ICC for over five years, and had previously worked on several other water projects. Lastly, among others, ICC employed two project managers for the project. At the start of the Dyer project, one had worked as a project manager for over 10 years and the other had worked with ICC for over three years and had worked on at least one large public works project.

But the trial court, relying on the wrong version of section 7068.1, never accounted for these facts in its ruling. It never, for instance, acknowledged ICC's undisputed contention that Brian had decades of construction experience and exercised oversight over the Dyer project, including by stopping unsafe work on the project. Nor did it consider whether, in light of Brian's oversight, it was necessary for Kevin to exercise further supervision over the Dyer project to secure full compliance with the law. It instead, based on an inapplicable version of section 7068.1, concluded that as a matter of law, Kevin needed to exercise direct supervision and control over the Dyer project— even if his doing so was unnecessary to ensure compliance with the law. We reject that conclusion.

We will remand the matter to the trial court for further consideration under the applicable version of section 7068.1. The trial court, as appropriate, may then remand the

13

issue to the arbitrator for further review. (Pub. Contract Code, § 10240.12 [trial court may "remand to the original arbitrator that portion of the dispute which the court concludes the arbitrator failed to determine"].) Because we find the trial court's reliance on the wrong version of section 7068.1 requires reversal, we need not address ICC's other arguments in favor of reversal.

III

*DWR's Remaining Arguments*

Having found unpersuasive the trial court's stated ground for finding ICC's license invalid, we consider DWR's alternative grounds for affirming the trial court's decision. First, it asserts the arbitrator had no jurisdiction to hear all, or at least some, of ICC's claims because ICC failed to exhaust the administrative procedures required in the parties' contract. Second, it contends ICC violated the Contractors' State License Law because Kevin held a Nevada contractor's license and qualified a Nevada company for a contractor's license. Third, it asserts ICC further violated the Contractors' State License Law because Kevin was not a "bona fide employee." And lastly, it contends the arbitrator's calculation of damages was based on impermissible hearsay. We find none of its arguments support a ruling in its favor.

A.      *Exhaustion*

We start with DWR's claim that the arbitrator lacked jurisdiction to hear all, or at least some, of ICC's claims.

1.      *All Claims*

DWR first argues the arbitrator lacked jurisdiction to hear all ICC's claims because ICC failed to complete the administrative process described in the parties' contract before initiating arbitration. We reject the argument.

The parties' contract described a three-step administrative process for resolving ICC's claims against DWR. First, if ICC objected to any DWR decision on the project, it needed to provide "written notice of potential claim stating such objections" to DWR's

14

chief engineer within 15 days of the issue arising. Second, if its claims remained unresolved after being noticed, ICC needed to submit a written statement and supporting documentation for any claims to DWR's chief engineer no later than 30 days after "the return of release on contract." And third, to the extent ICC presented any claims, DWR's chief engineer needed to provide a written decision on these claims. The contract explained that if ICC failed to timely submit the materials described in the contract, it would be deemed to have waived its claims.

The parties' contract also discussed the parties' rights to pursue their claims in arbitration under Public Contract Code section 10240 et seq. (See Pub. Contract Code, § 10240 ["The remedy for the resolution of claims arising under contracts made under the provisions of this chapter shall be arbitration pursuant to this chapter."].) One provision in this part of the code, Public Contract Code section 10240.2, discusses a party's need to exhaust the administrative procedures described in the parties' contract before proceeding to arbitration. It states: "A failure by the claimant to pursue diligently and exhaust, as to the claim, the required administrative procedures set forth in the contract under which the claim arose shall be a bar to arbitration hereunder until there has been compliance therewith. Subject to the preceding sentence, if more than 240 days have elapsed since acceptance of the work by the department, the claimant is entitled to arbitration, even though the procedures are not concluded."

In this case, ICC submitted several notices of its potential claims to DWR's chief engineer, as required at the first step of the contract's administrative process. But it never submitted a written statement for its claims, as mentioned at the second step of this process. DWR contends ICC consequently failed to exhaust the required administrative procedures described in the parties' contract. It then argues ICC was barred from pursuing arbitration as a result, citing to the first sentence in Public Contract Code section 10240.2, which again, requires a claimant to exhaust the contract's administrative procedures before proceeding to arbitration.

15

But the parties' contract and the whole of Public Contract Code section 10240.2 undercut this argument. Starting with the parties' contract, although ICC never submitted a written statement for its claims, it never had to. The contract required ICC to submit its written statement "not later than 30 days after the return of release on contract," but as DWR staff testified, DWR never provided this release. So although ICC never submitted a written statement for its claims, it still complied with the contract's administrative procedures to the extent required.

Turning to Public Contract Code section 10240.2, although the statute's first sentence generally bars a claimant from pursuing arbitration until it completes "the required administrative procedures set forth in the contract," the statute's second sentence provides an exception. Again, it states: "Subject to the preceding sentence, if more than 240 days have elapsed since acceptance of the work by the department, the claimant is entitled to arbitration, even though the procedures are not concluded." Here, ICC petitioned for arbitration more than 270 days after DWR accepted the work. Because more than 240 days had elapsed since DWR accepted ICC's work, and because ICC complied with the contract's administrative procedures to the extent required, ICC was "entitled to arbitration" under Public Contract Code section 10240.2's plain text.

Although DWR counters that Public Contract Code section 10240.2's second sentence is inapplicable, we find differently. DWR contends the statute's second sentence, in allowing the claimant to pursue arbitration "even though the procedures are not concluded" (Pub. Contract Code, § 10240.2), "presupposes that the administrative procedures were begun in the first place." It then asserts that because ICC never began the administrative process, it cannot claim the benefit of the statute's second sentence. But even accepting DWR's premise that this statute "presupposes that the administrative procedures were begun in the first place," we still reject DWR's conclusion that ICC never began this process. Under the parties' contract, the first step in the administrative process is the submittal of a timely notice of a potential claim. And here, with a few

16

exceptions that we will turn to next, DWR does not dispute that ICC timely submitted its notices of potential claims.

### 2. *Two Claims*

DWR alternatively argues the arbitrator lacked jurisdiction to hear two of ICC's claims because ICC failed to provide sufficient notice of these claims during the administrative process. We reject this argument too.

ICC filed 16 claims in arbitration, two of which are relevant here. In one claim, ICC alleged it was owed $1,116,000. It reasoned that DWR wrongly assessed liquidated damages in this amount based on ICC's alleged failure to make timely progress on the project. In another claim, ICC alleged it was owed $2,153,998.97, asserting that project delays caused it to incur additional costs in this amount for overhead and erosion control. DWR contends both claims fail because ICC never provided the notice required in the parties' contract—which again, required ICC to provide notice of potential claims to DWR's chief engineer within 15 days of the claims arising.

### a. *ICC's Claim Involving Liquidated Damages*

DWR starts with ICC's claim concerning the liquidated damages. ICC submitted several notices of potential claim to DWR's chief engineer that it alleged supported this claim. But DWR argues that all but one of these notices failed to mention liquidated damages and were submitted too late, "many months after DWR had assessed liquidated damages." It further argues that the one notice "that even mentions liquidated damages . . . was submitted prior to the withholding of any liquidated damages" and so "does not meet the contractual definition of [a notice of potential claim], *i.e.*, an 'objec[tion] to any decision, determination, order, directive, instruction, notice, action, or omission of engineer.' "

DWR's argument, however, omits several important details that undermine its argument. First, we accept that ICC submitted the notice mentioning liquidated damages before DWR deducted liquidated damages from ICC's pay. But ICC still submitted the

17

notice *after* DWR wrote a letter accusing ICC of being untimely—which, per the parties' contract, was ground for DWR to deduct liquidated damages. The contract, in particular, allowed DWR to deduct liquidated damages from ICC's pay "[i]f work is not completed, as determined by Engineer, within the time specified or any adjustments thereof . . . ." ICC submitted the notice, then, after DWR made the determination triggering its right to deduct liquidated damages. Second, we agree that the remaining notices never explicitly mentioned liquidated damages. But we still find it sufficiently clear that they all concerned liquidated damages. As the arbitrator found, and which DWR never disputes, these notices concerned DWR's refusal to grant requested time extensions that, if granted, "would have negated the imposed liquidated damages."

Apart from omitting these details, DWR also fails to provide an adequate record to evaluate its claim. DWR, again, argues that most of ICC's notices—which were submitted between September 2011 and May 2013—were submitted too late. It reasons that it withheld the $1,116,000 in liquidated damages months beforehand, between February 2011 and May 2011, and cites for factual support one of ICC's briefs in the arbitration proceedings. Although courts can treat a "factual statement in a brief . . . as an admission . . . when adverse to the party making it" (*Moore v. Powell* (1977) 70 Cal.App.3d 583, 586, fn. 2), the cited brief never asserted that DWR withheld the $1,116,000 in liquidated damages between February 2011 and May 2011. While it noted that DWR withheld some liquidated damages within this time period, it then said that DWR withheld the $1,116,000 in liquidated damages on later dates, stating: "[F]rom July 2011 to December 2016 [DWR] withheld the total liquidated damages amount of $1,116,000." Because we lack any further detail about the particulars of these later withholdings, we cannot say that ICC's notices submitted between September 2011 and May 2013 were all untimely.

18

### b. *ICC's Claim for Overhead and Erosion Control Costs*

DWR turns next to ICC's claim concerning the costs it incurred for overhead and erosion control. ICC submitted three notices of potential claim to DWR's chief engineer that it alleged supported this claim. The first mentioned additional office overhead costs incurred because of DWR's continued extension of the project. The second asserted that DWR's planned delay in conducting a required inspection would delay project completion. And the third, which ICC submitted over a year after the other two, purported to combine the two prior notices. ICC alleged in the combined notice that DWR's delays caused it to incur additional costs for overhead, site maintenance, and erosion control. Challenging the sufficiency of these notices, DWR contends the first two notices were inadequate because neither mentioned erosion control costs—and in fact, concerned "wholly-unrelated issues"—and the combined notice was inadequate because it was untimely.

DWR portrays the costs incurred for project delays and the costs incurred for erosion control as "wholly-unrelated issues," but they are not. The record shows that ICC incurred the costs for erosion control because of the project delays. An ICC witness testified, and the arbitrator ultimately found, that ICC would not have incurred these costs had the project not been delayed. DWR never disputes these facts. Under these circumstances, we are satisfied that ICC's objection to the project delays sufficed to preserve its claim for the costs that flowed from these delays. Per the parties' contract, after all, ICC only needed to state its "objections" to DWR's decision in a timely written notice of potential claim. ICC did that here.

### B. *Kevin's Nevada License and Nevada Business*

We consider next DWR's contention that Kevin held a Nevada contractor's license in violation of section 7068, subdivision (e) and qualified a Nevada company for a contractor's license in violation of section 7068.1, subdivision (a).

Section 7068, subdivision (e) generally prohibits a responsible managing employee from "hold[ing] any other active contractor's license while acting in the capacity of a qualifying individual." Section 7068.1, subdivision (a), in turn, as relevant here, generally prohibits a responsible managing employee for one individual or firm from "act[ing] in the capacity of the qualifying person for an additional individual or firm." Considering these requirements, and finding no applicable exceptions, the trial court found Kevin violated these provisions because he held an active Nevada contractor's license and qualified a Nevada business for a contractor's license. Although the court stopped short of holding that these violations caused ICC to lose its license, DWR contends they had this effect.

But even assuming ICC violated sections 7068 and 7068.1 for these reasons, we find these violations provide insufficient grounds for deeming ICC's license invalid at the time the violations occurred. Neither section 7068 nor section 7068.1, significantly, purports to automatically suspend a contractor's license for a violation of their terms. Many other provisions in the Contractors' State License Law, on the other hand, do impose this penalty. Under section 7068.2, subdivision (a), for example, a corporation's license will be automatically suspended if its responsible managing employee disassociates and is not replaced within 90 days. Under section 7085.6, subdivision (a)(1), as another example, a contractor's license will be automatically suspended if the contractor fails to comply with an arbitration award rendered under section 7085 et seq. And under section 7090.1, subdivision (a)(1), as one last example, a contractor's license will be automatically suspended if the contractor, among other things, fails to pay a civil penalty. (See also §§ 7076.2, subd. (a) [imposing the penalty of automatic license suspension], 7071.17, subd. (b)(1) [same], 7125, subd. (e)(2) [same].)

All these provisions demonstrate that the Legislature knows how to impose the penalty of automatic license suspension when it deems it inappropriate. So too does the history of section 7068.1. In a 1991 amendment to the statute, the Legislature added an

20

"automatic suspension" provision when a responsible managing employee qualifies more than three firms in any one-year period. Under those circumstances, the provision provided that the responsible managing employee's conduct "shall result in the disassociation of the qualifying individual and automatic suspension of the licensee's contractor's license." (Former § 7068.1; Stats. 1991, ch. 145, § 1.) But the Legislature removed this provision in 2006, years before the Dyer project began. (Former § 7068.1; Stats. 2006, ch. 106, § 2.) And since that time, the Legislature has included no similar penalty in either section 7068 or section 7068.1. Its declining to do so is telling, as we " ' "must assume that the Legislature knew how to create a[] [penalty] if it wished to do so." ' " (*DiCampli-Mintz v. County of Santa Clara* (2012) 55 Cal.4th 983, 992; see also *Ball v. Steadfast-BLK* (2011) 196 Cal.App.4th 694, 702 ["While the Legislature could have specified that a license is automatically suspended or otherwise invalidated where a contractor does business in a name other than that set forth in its license, it did not."].) Applying the scheme the Legislature drafted, rather than the one DWR prefers, we will not read an "automatic suspension" requirement into the text of sections 7068 and 7068.1.

DWR counters that adequate authority nonetheless supports a finding that ICC's license was automatically suspended when it violated these licensing requirements. Citing sections 7106 and 7106.5, it first contends the Contractors' State License Law "expressly provides that statutes providing for automatic suspension/revocation represent only one route to a determination that a contractor is not properly licensed." (Underscoring omitted.) But neither of these statutes supports its position. Section 7106 states: "The suspension or revocation of license as in this chapter provided may also be embraced in any action otherwise proper in any court involving the licensee's performance of his legal obligation as a contractor." DWR appears to believe this provision authorizes courts to deem a license automatically suspended whenever they think it appropriate. But section 7106 gives courts jurisdiction to determine whether

21

suspension or revocation of a license "as in this chapter provided" is appropriate, not authority to develop new grounds for finding a license automatically suspended at the time a violation occurs.

Section 7106.5 also provides no help to DWR. It provides: "The expiration, cancellation, forfeiture, revocation, or suspension of a license by operation of law or by order or decision of the registrar [of contractors] or a court of law, or the voluntary surrender of a license by a licensee, shall not deprive the registrar of jurisdiction to proceed with any investigation of or action or disciplinary proceeding against the license, or to render a decision suspending or revoking the license." Although this statute, consistent with section 7106, clearly contemplates that courts could suspend licenses, it does not purport to grant courts any authority at all. It instead "gives the registrar 'jurisdiction to proceed with any investigation' even though the matter is pending in a court." (*Judson Pacific-Murphy Corp. v. Durkee* (1956) 144 Cal.App.2d 377, 385.)

Turning to non-statutory considerations, DWR claims it is absurd to deem a license automatically suspended only in situations when the Legislature specifically said so. It reasons that because the Legislature provided for automatic suspension of a license when a licensee fails to provide workers' compensation insurance (see § 7125, subd. (e)(2)), courts should also be able to automatically suspend a license "where the [responsible managing employee] has nothing to do with the owner's project or is off opening his business in another state." While DWR may believe it sound policy to automatically suspend a company's license when the company's responsible managing employee improperly holds a separate license or qualifies a second business for a license, it is the Legislature's job, not ours, to determine appropriate policy. (See *Werner v. Southern Cal. etc. Newspapers* (1950) 35 Cal.2d 121, 129 ["It is for the Legislature . . . to choose between conflicting policies"].)

Lastly, DWR suggests that a contractor at least acts " 'outside its license' "—even if its license is not fully suspended—whenever it fails to comply with any requirement in

the Contractors' State License Law.  So under DWR's position, for instance, if a licensee's responsible managing employee improperly holds a separate license, then the licensee is effectively working outside its license and must disgorge all amounts it has been paid for ongoing projects.  So it is too, under DWR's position, if the licensee violates any other provision in the Contractors' State License Law.  We disagree.  A licensee acts outside the scope of its license when it operates in a capacity for which it is not licensed—as would be true, for example, if a contractor licensed to install roofs (see Cal. Code Regs., tit. 16, § 832.39) built a skyscraper—not simply because it failed to satisfy some aspect of the state licensing law.  (See *Ball v. Steadfast-BLK, supra*, 196 Cal.App.4th at pp. 702-703 [while the contractor may have failed to comply with state licensing requirements, these failures were "at most, grounds for disciplinary action" and did not trigger § 7031]; cf. *Waters v. Bourhis* (1985) 40 Cal.3d 424, 436 [a medical provider operates outside the scope of his or her license when operating "in a capacity for which he [or she] is not licensed -- for example, when a psychologist performs heart surgery"].)

Although we find DWR's arguments on this topic unpersuasive, none of this is to say that a responsible managing employee's failure to comply with the Contractors' State License Law is without consequences.  Section 7115, for instance, states that a failure to comply with this law "in any material respect . . . constitutes a cause for disciplinary action."  But we find no authority, statutory or otherwise, that deems a license automatically suspended simply because a responsible managing employee improperly holds a separate license or improperly qualifies a second business for a license.  While that type of conduct may provide grounds for discipline, even perhaps license suspension, it does not result in the license being automatically suspended at the moment the conduct occurs.

23

C.    *Bona Fide Employee*

We turn next to DWR's claim that Kevin was not a "bona fide employee" within the meaning of section 7068, subdivision (c)—which in DWR's telling, provides an additional ground for finding that ICC operated without a valid license.

At the start of the Dyer project, and as relevant here, former section 7068, subdivision (c) stated:  "A responsible managing employee for the purpose of this chapter shall mean an individual who is a bona fide employee of the applicant and is actively engaged in the classification of work for which that responsible managing employee is the qualifying person in behalf of the applicant."  (Stats. 2004, ch. 865, § 9.)  A former regulation defined the phrase "bona fide employee" at the time of the project.  It stated: "For purposes of Section 7068 of the [Business and Professions] Code, 'bona fide employee' of the applicant means an employee who is permanently employed by the applicant and is actively engaged in the operation of the applicant's contracting business for at least 32 hours or 80% of the total hours per week such business is in operation, whichever is less."  (Former Cal. Code Regs., tit. 16, § 823, subd. (a).)

The arbitrator here found Kevin met these criteria, citing, in support, Brian's declaration, Kevin's declaration, ICC's accounting expert's testimony, and tax records. Substantial evidence in the record supports the arbitrator's finding.  Brian, for instance, said Kevin worked "full-time for ICC" during the Dyer project and said he believed Kevin came to work "every day."  Both Brian and Kevin, moreover, said that Kevin oversaw a levee rehabilitation project for ICC at the time of the Dyer project and that the brothers spoke regularly about ICC's projects during this time.  Both added that Kevin was an employee of ICC during the Dyer project.  Consistent with their statements, Kevin's W-2s from 2009 to 2012 confirm that ICC paid him during the time of the Dyer project.  This evidence sufficiently established that Kevin was a "bona fide employee" of ICC during the time of the Dyer project.

24

In challenging the arbitrator's decision, DWR ignores all but the tax records. It claims "[t]here was no substantial evidence . . . that Kevin met the criteria of a bona fide employee, and ample evidence that he did not." Then, in support, it notes that Kevin had only limited involvement with the Dyer project, that ICC's produced documents in arbitration (over 60,000 in total) showed Kevin's name only four times, that Brian said he could not recall Kevin's job responsibilities at ICC between 2009 and 2012, and that Kevin's income tax withholdings between 2008 and 2011 were "roughly half (or less) of the amount withheld in 2007, which suggests that Kevin was less than full-time during Dyer."

But in challenging the sufficiency of the evidence, DWR needed to "cite the evidence in the record supporting the judgment and explain why such evidence is insufficient as a matter of law"—not ignore this evidence and simply focus on evidence favorable to its position. (*Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1408.) As other courts have explained, an appellant "who cites and discusses only evidence in [his or] her favor fails to demonstrate any error and waives the contention that the evidence is insufficient to support the judgment." (*Ibid.*; see also *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.) So it is here.

DWR's offered evidence, moreover, is not particularly persuasive in any event. First, although Kevin had limited involvement with the Dyer project, that does not itself establish that Kevin was not a bona fide employee of ICC. Perhaps DWR believes that the Dyer project was ICC's only project at the time; and so to the extent Kevin was not working on that project, he was not working for ICC at all. But as both Kevin and Brian stated, Kevin oversaw a levee rehabilitation project for ICC at the time of the Dyer project. Second, while Kevin's name appeared in few of ICC's produced documents in arbitration, that means little without knowing the documents DWR requested. And because DWR never reveals the documents it requested, we take nothing from this detail. Third, while Brian could not recall "offhand" Kevin's job responsibilities at the time of

25

the Dyer project during his deposition—which took place years after the Dyer project and before DWR even claimed Kevin was not a bona fide employee—he still said Kevin worked "full-time for ICC" and said he believed Kevin came to work "every day." He also later, as mentioned, explained that Kevin oversaw a levee rehabilitation project at the time of the Dyer project. And fourth, although Kevin's income tax withholdings between 2008 and 2011 were far less than his withholding in 2007, the record reveals a ready explanation for the drop—the Great Recession. As Kevin declared, at the time of the Dyer project, "[t]he Great Recession was in full force and was impacting the construction industry and the work available to the company."

Apart from citing this unpersuasive evidence, DWR also claims Kevin's and Brian's failure to say that Kevin worked at least 32 hours a week during the Dyer project "is powerful proof" that he did not. But again, DWR ignores that Brian testified that Kevin worked "full-time for ICC" during the Dyer project. Brian may never have explicitly said that Kevin worked at least 32 hours or 80 percent of the weekly hours ICC was in operation, but the arbitrator reasonably could have concluded that his testimony— together with all the other evidence of Kevin's work for ICC—demonstrated that Kevin was a "bona fide employee" of ICC during the time of the Dyer project. (See *South Coast Framing, Inc. v. Workers' Comp. Appeals Bd.* (2015) 61 Cal.4th 291, 303 [substantial evidence is evidence that is " 'reasonable in nature, credible, and of solid value such that a reasonable mind might accept it as adequate to support a conclusion' "].)[6]

---

[6] DWR's claim that Kevin was not a bona fide employee of ICC is the last of its reasons for attacking the validity of ICC's license. Because we reject each of its arguments on this topic, we also reject DWR's claim for disgorgement in its cross-appeal, which is premised on our finding that ICC operated without a license.

D. *Hearsay*

Lastly, we consider DWR's contention that the arbitrator relied solely on inadmissible hearsay when calculating damages.

California Code of Regulations, title 1, section 1300 et seq. describes the admissibility of evidence in arbitration proceedings of the type here. (See Cal. Code Regs., tit. 1, §§ 1300, 1387.) As relevant here, it provides: "Any relevant evidence, including hearsay, shall be admitted if it is the sort of evidence on which responsible persons are accustomed to rely in the conduct of serious affairs, regardless of the existence of any common law or statutory rule which might make improper the admission of such evidence over objection in civil actions, provided, however, hearsay evidence even though not objected to shall not be sufficient in itself to support a finding unless it would be admissible over objection in civil actions." (*Id.*, § 1387, subd. (c).)

In this case, ICC's expert, Gene Lash, testified about the damages ICC suffered on the Dyer project. He explained that he reviewed all ICC's claims and supporting documentation, interviewed several ICC experts, reviewed DWR's expert's testimony and work papers, and interviewed several ICC employees (including Brian, ICC's project foremen for the Dyer project, and ICC's chief financial officer). Based on his investigations, and relying in particular on four boxes of "work papers and records," he determined that ICC was owed over $9,000,000 in damages. DWR objected on hearsay grounds both to the documents in these boxes and to Lash's testimony. But the arbitrator, rejecting these objections, found the documents fell within the business records exception to the hearsay rule and then relied on Lash's testimony in calculating part of the damages owed ICC.

Renewing its objection on appeal, DWR contends Lash's testimony relied solely on hearsay and "was effectively ICC's only evidence on the existence of its alleged damages." It asserts that while Lash said he reviewed the four boxes of documents, these documents contained hearsay and were not admissible under the business records

exception. And it contends that while Lash said he interviewed several ICC employees, all but one of these employees had no involvement in preparing ICC's notices of potential claim and, as to that one employee who was involved, he indicated he had only limited involvement in preparing one of these notices and offered no detail about his role. For these reasons, DWR argues that the arbitrator relied "solely on hearsay evidence for which no exception applies" and that no part of its award can stand. (Underscoring omitted.)

We reject its argument for two reasons. First, for most of the arbitration award, the arbitrator does not appear to have relied on Lash's testimony. The arbitrator, again, awarded ICC over $5,000,000 in damages. The calculation for most of this amount—over $3,200,000—was established independent of Lash's testimony. That included the arbitrator's awarding ICC $1,116,000 for improperly withheld liquidated damages, $1,616,190.09 for additional improperly withheld amounts, and nearly $500,000 in prejudgment interest for these amounts. Although Lash briefly noted that DWR withheld certain amounts in his testimony, DWR itself acknowledged it withheld these amounts, stating it withheld $1,116,000 in liquidated damages and $1,616,190.09 for other purposes. For most of the arbitration award, then, DWR has not shown that Lash's testimony played any meaningful role.

Second, although the arbitrator explicitly relied on Lash's testimony for part of the award, DWR has not shown that the arbitrator relied "solely on hearsay evidence for which no exception applies" for this portion of the award. DWR, again, contends Lash relied on four boxes of documents that contained hearsay and that were not admissible under the business records exception. These documents included, according to the arbitrator, "[t]he cost and other related documents, the Daily Inspections Reports of DWR, and the Daily [R]eports of ICC." But although DWR contends these materials contained inadmissible hearsay, it never cites where these records appear in the record, if at all. And without being able to review these records, we cannot properly evaluate

28

DWR's reasons for arguing these records contain inadmissible hearsay.  Nor can we properly evaluate DWR's vague claim that "many of the documents on which Mr. Lash relied" are inadmissible because "they were prepared by ICC for purposes of advancing its claims in arbitration."  DWR never explains which documents would be inadmissible for this reason, nor explains why it believes these documents were prepared in anticipation of litigation.  Because DWR has left us unable to effectively review its claim, we find its argument forfeited.

DISPOSITION

The order vacating the arbitration award is reversed.  The matter is remanded to the trial court for further consideration under the applicable version of section 7068.1.  ICC is entitled to recover its costs on appeal.  (Cal. Rules of Court, rule 8.278(a).)


/s/       <br>BOULWARE EURIE, J.  


We concur:


/s/      
ROBIE, Acting P. J.


/s/      
DUARTE, J.